IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

---

KATHRYN LINDQUIST, as SUCCESSOR TO TERRY NEWENDORP, JOHN RUGGIRELLO and PAUL DILLBECK,

    Plaintiffs,

-against-

VENTURE GLOBAL LNG, INC.,

    Defendant.

Civil Action No. 23-cv-0879

JURY TRIAL DEMANDED

---

# COMPLAINT

Plaintiffs Kathryn Lindquist ("Lindquist"), as the widow of and successor to Terry Newendorp ("Newendorp"), John ("Ruggirello") and Paul Dillbeck ("Dillbeck"; collectively "Plaintiffs"), as and for their Complaint herein against defendant Venture Global LNG, Inc., formerly known as Venture Global LNG, LLC ("Venture Global", the "Company" or "Defendant"), allege as follows:

## Nature Of The Action

1. This action arises out of a malicious and bad faith scheme perpetrated by the Company, acting through its co-founders and majority shareholders Bob Pender ("Pender") and Michael Sabel ("Sabel"), who have controlled and continue to control the Company at all relevant times, to prevent Plaintiffs from ever exercising their respective vested stock options and acquiring shares – the very reason they each became associated with the Company, then a mere startup valued at approximately $1 million in or about 2014, in the first place.

2. The Company, a supplier of liquified natural gas ("LNG"), is now valued at over

4884-4457-5342, v.1

*$15 billion*, with Pender and Sabel together owning approximately 80% (a $12 billion stake), yet Pender and Sabel have purposefully and in bad faith acted to frustrate Plaintiffs' exercises of the options, which are infinitesimal compared to Pender and Sabel's holdings, but still worth in excess of $77 million.

3. For example, Newendorp joined the Company in 2014 as an Advisor and then a Director when he was stricken with cancer. The Company awarded him ten-year options without restrictions. The Company pretended that they would take care of him and his family and wanted to see him healthy and recovered. But instead, in 2017 as the illness worsened, they cajoled him into signing an amended stock option agreement with a new provision, never previously discussed, requiring consent of the Company "Compensation Committee" to exercise his options pre-IPO – with the Company secretly knowing full well that no consent would ever be granted.

4. Just before Newendorp passed away in early 2018, he made it known to the Company and others that one of his dying wishes was for his widow, Lindquist, to exercise his options and enjoy the fruits thereof. In May 2023, with the option set to expire in a few months, Lindquist attempted to exercise the options – and the Company inexplicably, without justification and in bad faith, flatly refused to allow the exercise.

5. Even if the amended option agreement is enforceable such that consent is now required for exercise of the options pre-IPO, Delaware law, which governs, requires that any future act of discretion, such as a decision whether to grant consent, must be performed in accordance with the implied covenant of good faith, and that it is bad faith as a matter of law to act solely for purposes of frustrating a holder from exercising an option.

6. Here, the Company, through Sabel and Pender, is acting in bad faith, as there is simply no good faith reason for not granting Lindquist consent. Indeed, the Company would

benefit from Lindquist (and others) exercising their options by being paid the proceeds of the exercise price, as well as by the goodwill of rewarding those who contributed to the Company's considerable success.

7. Instead, the Company has chosen to act in bad faith with respect to Lindquist (as well as plaintiffs Ruggirello and Dillbeck as set forth below), and has therefore breached the option agreements. Plaintiffs would not have joined the Company, provided services to the Company, or allowed the Company to use and benefit from their respective names, reputation and/or professional credibility but for the options. Nevertheless, Sabel and Pender are purposefully acting to frustrate the exercise of the options and to cause the options to expire either wholly out of malice, in order to further consolidate their personal ownership, or to avoid dilution at zero cost to them individually.

8. Indeed, Pender and Sabel are well aware that nearly $1 billion in stock options are outstanding and there is a significant risk of dilution to them personally in the event options are exercised, and Pender and Sabel are clearly acting purely in their own personal self-interest to prevent exercise, which is the epitome of bad faith.

9. In any event, the Company has breached the option agreements and owes Plaintiffs damages in an amount to be determined at trial, but believed to be collectively in excess of $77 million.

**The Parties, Jurisdiction and Venue**

10. Lindquist is a citizen of the State of Maryland.

11. Ruggirello is a citizen of the State of Florida.

12. Dillbeck is a citizen of Washington, D.C.

13. Upon information and belief, the Company is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1001 19th Street, North Suite

1500, Arlington, Virginia 22209. Upon information and belief, the Company is a producer of North American liquified natural gas. According to the Company's website, the Company's export facilities, Calcasieu Pass, Plaquemines, LNG, CP2 LNG and Delta LNG will supply the world's growing demand for North American energy.

14. The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

16. This Court has personal jurisdiction over the Company because it is a citizen of the Commonwealth of Virginia. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the Company resides in this District and a substantial part of the events and omissions giving rise to the claims herein occurred in this District.

**Facts Common To All Claims**

I. **Relevant Facts Relating to Newendorp**.

    A. **Newendorp Joins The Company's Advisory Board And Is Granted Stock Options**.

17. Initially, in or about early 2014, the Company retained Newendorp as Chief Executive Officer and granted him a ten-year option to purchase 1,000 shares at $1 per share, but took away those options claiming that Newendorp could not continue in the role of CEO due to being stricken with cancer.

18. The Company retained Newendorp as an Advisor instead. By letter dated October 2, 2014, the Company awarded Newendorp a ten-year option to purchase 1,000 shares of Company common stock at a strike price of $1,000 per share (the "2014 Newendorp Option Agreement"; Exhibit A hereto). There were no restrictions on the exercise of the options in the 2014

Newendorp Option Agreement. Newendorp would not have become associated with the Company but for the options and the upside the options presented.

19. Newendorp was a renowned international project development and finance expert with great expertise as to LNG projects. The Company listed Newendorp as an Advisor on numerous documentation, including investment and marketing materials, trading off his name, reputation and professional credibility to attract employees, investors and business. The Company's valuation continued to increase.

20. The Company continued to benefit by its association with Newendorp and, by letter dated June 1, 2016, the Company offered Newendorp a position on the Board of Directors. Newendorp accepted and the Company awarded Newendorp options to purchase 500 shares of common stock at a strike price of $3,157 per share (the "2016 Newendorp Option Agreement"; Exhibit B hereto). Again, there were no restrictions on the exercise of the options.

21. The Company's value continued to increase, and the Company, particularly Pender and Sabel, were well aware of the Company's success and the increasing value of the options.

22. Accordingly, by email dated June 27, 2017 (Exhibit C hereto), the Company awarded Newendorp additional options to purchase 500 shares, but only if Newendorp would sign new stock option agreements relating to his earlier grants and current grant within a few days, or by July 6, 2017, right after the July 4th holiday weekend (the "2017 Newendorp Option Agreements"; Exhibits D, E and F hereto). Newendorp trusted the Company and did so.

23. The 2017 Newendorp Option Agreements contain restrictions to exercise the options that were not present in the original agreements. In particular, the agreements contain a clause attempting to defeat, in large part, the purpose of Newendorp having an "option" in the first place – a requirement that, pre-IPO, any "exercise may only be effected with the consent of the

5

[Compensation] Committee":

> "You may exercise the vested portion of your Option in accordance with the terms of this Agreement and the Plan at any time prior to the Expiration Date, provided, however, that prior to the date of consummation of a Change in Control or IPO, such exercise may only be effected with the consent of the Committee. The vested portion of your Option may not be exercised following the Expiration Date set forth on the cover sheet of the Agreement. Your Options will expire on such Expiration Date."

(2017 Newendorp Option Agreement at Ex. D, p. 3).

24. Upon information and belief, at or about the time the Company caused Newendorp to sign the 2017 Newendorp Option Agreements, the Company, and particularly Pender and Sabel, were well aware that they would never consent to the exercise, which was in and of itself an act of bad faith, and part of the overall scheme.

25. The Company has had numerous opportunities to conduct an IPO, but has purposefully chosen not to do so, seemingly intent on causing the options to expire by refusing to grant consent to the exercise thereof.

26. As referenced above, the Company has had great success and, upon information and belief, the Company common shares are now worth approximately $25,000 per share (see screen shot showing a valuation by PIMCO, one of the Company's largest shareholders, listing the shares as being valued on its books at approximately $25,000 per share, at Exhibit G hereto).

27. At the time of his death on March 5, 2018, Newendorp had vested in 600 options from the initial grant as an Advisor at an exercise price of $1,000 per share, 218 options from the second grant as a Director at an exercise price of $3,157 per share, and 62 options from the third grant at an exercise price of $3,568 per share. Hence, the shares covered by Newendorp's Options are worth not less $20,490,558 ((600 shares x $25,000 ($15,000,000) less exercise price of $1,000 ($600,000) = $14,400,000); 218 shares x $25,000 ($5,450,000) less exercise price of $3,157 ($688,226) = $4,761,774); and 62 shares x $25,000 ($1,550,000) less exercise price of $3,568

6

($221,216) = $1,328,784)).

**B.     The Company Wrongfully Prevents Lindquist From Exercising The Options And/Or Obtaining the Shares.**

28.     By letter to the Company dated March 31, 2023, Lindquist attempted to exercise the initial 600 vested options (the "March 31 Letter"; Exhibit H hereto).

29.     By email dated April 7, 2023, the Company, through its General Counsel Keith Larson ("Larson"), responded in a manner designed to frustrate exercise of the shares. Larson wrote: "The Compensation Committee will consider your request promptly. To better inform the Compensation Committee, could you kindly please confirm how you intend to (i) pay the $600,000 exercise price for the options, and (ii) satisfy applicable withholding tax obligations arising due to your exercise. For your information, the current market value per share is $18,000" ("March 31 Letter"; Exhibit I hereto).

30.     In writing that letter, the Company, upon information and belief, was hoping that Lindquist would not have the financial means to exercise the option, which further demonstrates its bad faith.

31.     In particular, even at the Company's then-claimed valuation of $18,000 per share (and as set forth above the true market valuation is substantially higher), a withholding obligation would likely be approximately 35% of the value of the shares, or $3,780,000 ($10,800,000 x 35%) – a substantial sum that few can pay. Thus, the Company was hoping that Lindquist would be unable to satisfy this purported obligation and thereby prevent exercise of the options.

32.     Irrespective of what the Company anticipated, however, Lindquist responded with a letter dated April 13, 2023, with a careful plan for paying the exercise price and the withholding taxes.

33.     Once it was clear that Lindquist had the wherewithal to meet the Company's

exercise conditions, Larson, by email dated May 12, 2023 sent on behalf of the Company, wrote back: "Yesterday afternoon, the Compensation Committee of the Board of Directors of Venture Global LNG, Inc. met to consider your request to exercise your vested options in respect of 600 series A shares of the company. After careful consideration, the Compensation Committee decided not to consent to the exercise of your options" (Exhibit J hereto).

34. The Company gave no reason or rationale for its decision.

35. Shocked and heartbroken, especially since Pender and Sabel had always claimed to care about Newendorp and his family, Lindquist wrote back by email dated May 12, 2023: "I truly want to understand why I have been denied this opportunity to fulfill one of Terry's last wishes" (Exhibit K hereto).

36. Tellingly, the Company did not respond for nearly a month, as there is no good faith answer to this question.

37. It was not until the Company was barraged by similar requests from other option holders and accused of bad faith that the Company finally responded nearly a month later by stating "the Company has a material interest in restricting the exercise of vested stock options prior to the date of any Change or Control or IPO of the Company" (Exhibit L hereto).

38. This purported excuse was not the stated or actual reason for the initial denial of consent to Lindquist, and was clearly made up after-the-fact as the pressure began to mount against the Company as it was barraged by accusations that the Company was not acting in good faith in denying consent, as required by law. Upon information and belief, Pender and Sabel (perhaps on advice of counsel) began to understand that they needed to purport to be acting in good faith in determining whether to consent to the exercise of the options or not, and could not simply "just say no" to benefit themselves individually. As a result, they began making efforts to improve the

optics of their bad faith behavior, to make it seem like they had a legitimate reason to deny consent, when in fact they had no such good faith reason.

39. The Company's belated and fabricated purported rationale for denial of the option exercise is inadequate. The Company did not elaborate on what the Company's alleged "material interest" is and how it could possible negatively impact the Company if Lindquist exercised the options. Option holders regularly exercise options pre-IPO, and the Company would benefit from the proceeds of the exercise and the goodwill in having those who contributed to the Company enjoy the fruits of its success.

40. In any event, Pender and Sabel are acting maliciously and/or to consolidate their ownership and avoid dilution at zero cost to maximize the benefits to themselves, purely in self-interest and to deprive holders of the benefit of their options.

## II. FACTS RELEVANT TO PLAINTIFF RUGGIRELLO

### A. Ruggirello Joins The Company As An Advisor And Is Granted Stock Options.

41. By letter dated January 3, 2014, the Company offered Ruggirello a position on the Company's Advisory Board and a ten-year option to purchase 1,000 shares of Company common stock at an exercise price of $1 per share, which Ruggirello accepted (the "2014 Ruggirello Option Agreement"; Exhibit M hereto). There were no restrictions on the exercise of the options in the 2014 Ruggirello Option Agreement. Ruggirello would not have become associated with the Company absent the options and the upside the options presented.

42. The Company listed Ruggirello as an Advisor on numerous documentation, including investment and marketing materials, trading off his name, reputation and professional credibility to attract employees, investors and business. For example, the Company publicly stated that Ruggirello is "one the most experienced executives in the energy industry with extensive

global project development and energy operations background, and we will benefit greatly from his involvement as we grow our business and develop our initial phase of 5 MTPA of liquefaction capacity". The Company's valuation continued to increase.

43. The Company continued to benefit by its association with Ruggirello, and Ruggirello joined the Company as a Director.

44. The Company's value continued to increase, and the Company, particularly Pender and Sabel, were well aware of the Company's success and the increasing value of the options.

45. Accordingly, by email dated June 27, 2017 (Exhibit N hereto), the Company awarded Ruggirello additional options to purchase 500 shares at an exercise price of $3,568, but only if Ruggirello would sign new stock option agreements with respect to his earlier grants and current grant within a few days, or by July 6, 2017, right after the July 4th holiday weekend (the "2017 Ruggirello Option Agreements"; Exhibits O and P hereto) (similar to what the Company required of Newendorp as set forth above). Ruggirello trusted the Company and did so.

46. The 2017 Ruggirello Option Agreements contain restrictions to exercise the options that were not present in the original agreements, namely the above-referenced requirement that, pre-IPO, any "exercise may only be effected with the consent of the [Compensation] Committee".

47. The Company has had numerous opportunities to conduct an IPO, but has purposefully chosen not to, seemingly intent on causing the options to expire by refusing to grant consent to the exercise thereof.

48. Ruggirello is fully vested in all of his options, namely the initial grant of 1,000 options and the subsequent grant of 500 options.

    **B.**     **The Company Wrongfully Prevents Ruggirello From Exercising The Options And/Or Obtaining the Shares.**

49. With the initial grant of 1,000 options expiring within six months (January 2024),

Ruggirello, by email dated May 16, 2023, advised the Company of his intent and desire to exercise the options (Exhibit Q hereto).

50. By letter dated June 8, 2023, the Company refused to grant consent for that exercise. The Company wrote: "A meeting of the Compensation Committee of the Board of Directors of the Company was held yesterday to consider, among other matters, your request to exercise the above-referenced stock options. After due consideration, the Compensation Committee declined to provide its consent to your request" (Exhibit R hereto). No explanation was given.

51. For the reasons set forth above with regard to the denial of Lindquist's request to exercise the options of her late husband, this denial is and was in bad faith, in breach of the implied covenant of good faith, and therefore a breach of the subject option agreements.

52. Accordingly, Ruggirello has suffered damages in an amount to be determined at trial, but believed to be in excess of $35,715,000 ((1,000 shares x $25,000 ($25,000,000) less exercise price of $1 ($1,000) = $24,999,000); and 500 shares x $25,000 ($12,500,000) less exercise price of $3,568 ($1,784,000) = $10,716,000)).

**III.    Facts Relevant To Plaintiff Dillbeck.**

   **A.    Dillbeck Joins The Company As General Counsel And Is Awarded Stock Options.**

53. By letter dated August 25, 2014, the Company offered Dillbeck a position as General Counsel of the Company and a ten-year option to purchase 725 shares of Company common stock at an exercise price of $1,000 per share, which Dillbeck accepted (Exhibit S hereto). There were no restrictions on the exercise of the options. Dillbeck would not have joined the Company absent the options and the upside the options presented. Dillbeck vested in options to purchase 666 shares of common stock.

54. By letter dated December 22, 2014, the Company awarded Dillbeck a ten-year

11

option to purchase 275 shares of Company common stock at an exercise price of $2,000 per share (Exhibit T hereto). There were no restrictions on the exercise of the options. Dillbeck vested in options to purchase 229 shares of stock.

55. In or about July 2017, the Company caused Dillbeck to sign two Amended and Restated Stock Option Agreements relating to the options (the "2017 Dillbeck Option Agreements", which are virtually identical to the 2017 Newendorp Option Agreements and the 2017 Ruggirello Option Agreements described above and attached hereto; collectively, the "2017 Option Agreements"). The 2017 Dillbeck Option Agreements contain restrictions to exercise the options that were not present in the original agreements, namely the above-referenced requirement that, pre-IPO, any "exercise may only be effected with the consent of the [Compensation] Committee".

### B. The Company Wrongfully Prevents Dillbeck From Exercising The Options And/Or Obtaining the Shares.

56. By letter dated February 16, 2023, Dillbeck, along with other option holders, reached out to the Company to notify the Company of Dillbeck's and others' intention to exercise options before they expire, and to coordinate with the Company on the process and paperwork for doing so (Exhibit U hereto).

57. By letter dated March 1, 2023, the Company responded to Dillbeck and advised him that it would not permit Dillbeck to exercise his options. In particular, the Company wrote that "the consent of the Compensation Committee [of the Company] is required for any exercise", and "[u]pon consideration of your request, the Compensation Committee did not consent", with no explanation whatsoever (see the "March 1 Letter"; Exhibit V hereto).

58. By letter dated March 8, 2023, Dillbeck (and other option holders) responded to the Company (Exhibit W hereto). They requested certain additional information, including the

grounds upon which the so-called "Compensation Committee" was refusing to allow them to exercise the options.

59. The Company responded by letter dated March 10, 2023, again merely stating that the "Compensation Committee" would not provide consent to the exercise, and refusing to provide any information or rationale (Exhibit X hereto).

60. For the reasons set forth above with regard to the denial of Lindquist's and Ruggirello's requests to exercise their respective options, this denial is and was in bad faith, in breach of the implied covenant of good faith, and therefore a breach of the subject option agreements.

61. Accordingly, Dillbeck has suffered damages in an amount to be determined at trial, but believed to be in excess of $21,203,000 ((664 shares x $25,000 ($16,600,000) less exercise price of $1,000 per share ($664,0000) = $15,936,000); and 229 shares x $25,000 ($5,725,000) less exercise price of $2,000 per share ($458,000) = $5,267,000)).

## FIRST CAUSE OF ACTION

**(Breach of the 2017 Option Agreements)**

62. Plaintiffs repeats and reallege each and every allegation set forth above as if fully set forth herein.

63. The Company has breached its respective 2017 Option Agreements and/or the implied covenant of good faith thereunder by refusing, through the purported "Compensation Committee", to grant consent for Plaintiffs' respective exercises of their respective options.

64. "In Delaware, the implied covenant of good faith and fair dealing inheres in every contract, including those governing employment. The covenant requires parties to a contract to refrain from arbitrary or unreasonable conduct which deprives a party from receiving the fruits of

the bargain." Markow v. Synageva Biopharma Corp., 2016 WL 1613419, *7 (Sup. Ct. Del. March 3, 2016) (internal quotation marks omitted).  "The covenant of good faith and fair dealing embodies the law's expectation that each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.  The covenant protects an agreement's spirit against underhanded tactics that deny a party the fruits of the bargain."  Sheehan v. AssuredPartners, Inc., 2020 WL 2838575, *11 (Ch. Ct. May 29, 2020) (internal quotation marks omitted).

65. Further, "a stock option, in and of itself, [] engenders a duty of the employer to deal in good faith, i.e., [to] refrain from directly frustrating the exercise of the option."  Haney v. Laub, 312 A.2d 330, 334 (Sup. Ct. 1973).  The company may not act to "otherwise frustrate the exercise of the options for that purpose or reason".  Haney, 312 A.2d at 333.

66. "The implied covenant is particularly important in contracts that endow one party with discretion in performance, i.e., in contracts that defer a decision at the time of contracting and empower one party to make that decision later.  Simply put, the implied covenant requires that the 'discretion-exercising party' make that decision in good faith."  Amirsaleh v. Board of Trade of the City of New York, 2008 WL 4182998, *8 (Ch. Ct. September 11, 2008); Charlotte Broadcasting, LLC v. Davis Broadcasting of Atlanta, LLC, 2015 WL 3863245, *7 (Sup. Ct. June 10, 2015) ("the implied covenant of good faith particularly applies where the contract permits a party to exercise sole discretion.  Delaware case law requires a party to exercise such discretion reasonably and in good faith). "[P]arties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms."  Amirsaleh, 2008 WL 4182998 at *8-9.

67. "More recent case law reflects a willingness to allow implied covenant claims to

survive, despite the presence of relevant contract language, where a defendant failed to uphold the plaintiff's reasonable expectations under that provision or failed to exercise discretion under the contract reasonably." Markow v. Synageva Biopharma Corp., 2016 WL 1613419, *7-8 (Sup. Ct. Del. March 3, 2016) (internal quotation marks omitted, emphasis in original).

68. Further, a duty to disclose reasonable information goes hand-in-hand with the duty to act in good faith. As set forth above, the Company has a duty to refrain from directly frustrating the exercise of the option(s), which may include refusing to provide information reasonable and necessary to the decision to exercise and/or the process of exercising the options. See, e.g., Powe v. Cambium Learning Company, 2009 WL 2001440, *4-6 (S.D.N.Y. July 9, 2009) (a failure to provide requested information that thereby prevents option holder from exercising option constitutes a breach of the company's obligations because allowing exercise of the options was contemplated under the agreement); Lentz v. Mathias, 2022 WL 2719504, *17-18 (Ch. Ct. July 13, 2022) (company has general duty of disclosure to those associated with the company making an investment decision); SEC Rule 701(e), 17 CFR § 230.701 (option holders entitled to financial information from a private company).

69. Here, co-founders and majority shareholders Sabel and Pender who, upon information and belief, comprise any so-called "Compensation Committee" to the extent it even existed, have acted in bad faith in trying to prevent the exercise of the respective options and frustrate Plaintiffs' (and others') right to obtain shares in the Company, in order to enrich themselves, consolidate their ownership of the Company, avoid dilution of their shares at zero cost, and/or simply to be malicious.

70. The Company is the discretion-exercising party and is required to exercise that discretion reasonably and in good faith, yet has clearly failed to do so.

71. Indeed, the Company, Pender, Sabel and/or the alleged Compensation Committee are required to act reasonably and in good faith in considering a grant of consent, and to not act for an improper purpose, such as simply preventing the exercise of the options for the mere sake of doing so.  Here, they have failed to act reasonably or in good faith and have acted for improper purposes, as evidenced by, among other things, the following, upon information and belief:

- The Company either failed to set up a Compensation Committee or failed to set up one that is independent and objective, which one would reasonably expect the Company to have established under the circumstances;

- To the extent a Compensation Committee was actually established, there were no true deliberations of the Compensation Committee, and certainly not by any independent members thereof;

- To the contrary, the decision to withhold consent was made solely by Sabel and Pender for the sole purpose of benefitting themselves or acting maliciously to deprive Plaintiffs of their respective options (see, e.g., Markow, 2016 WL 1613419 at *7-8 (Board acted unreasonably and in bad faith in purposefully waiting to price options in order to secure a financial windfall for themselves, as such conduct "frustrated [plaintiffs'] reasonable expectation of receiving the fair market value of their options, as bargained for under their employment agreements"); Sheehan, 2020 WL 2838575 at *11) (allegations that company terminated employees "in order to steal [their] Class B Profits Interest for zero consideration to pay nothing more than the cost for the [employees'] Class A-2 Interests adequately pleads that the defendant's conduct [was] driven by an improper purpose"; breach of implied covenant claim sustained));

- In the alternative, the decision to withhold consent was made for the additional purpose of improperly favoring others more connected to the Company, including Sabel and Pender (see, e.g., Amirsaleh v. Board of Trade of City on New York, Inc., 2009 WL 3756700 at *4 (Ch. Ct. Nov. 9, 2009) (giving "connected" members more time to elect merger consideration to be received "would plainly amount to bad faith"); and/or

- To the extent there was an independent Compensation Committee that made any decision at all, Sabel and Pender, upon information and belief, wrongfully interfered with that decision to cause the Compensation Committee to withhold consent to further their own self-interests as set forth above (see, e.g., Semple v. Eyeblaster, Inc., 2009 WL 2709281, *5 (S.D.N.Y. Aug. 27, 2009) (interference with the granting of consent for employees to exercise options constitutes a breach of the implied covenant of good faith)).

72. The Company's wrongdoing is further evidenced by its repeated refusal to disclose to Plaintiffs contemporaneously the *reasons* for the purported decision to withhold consent, despite

its duty to disclose. This is quite telling and demonstrates that any decision and the decision-making process were improper (see, e.g., Amirsaleh, 2008 WL 4182998 at *8-9 (company's "clandestine and unexplained decision to stop accepting late forms [for election to exercise options]" in an "arbitrary or unreasonable" manner thereby frustrating the "overarching purpose" of the agreement is sufficient to demonstrate a breach of the implied covenant of good faith).

73. Indeed, at the various times of the refusals to provide consent, the Company did not even attempt to formulate a reason or state that the decision would be revisited at a later date – these were flat-out rejections without explanation, recourse, or any rationale.

74. Moreover, the Company's bad faith is evidenced by its conduct directed at Lindquist referenced above, including where the Company first inquired about how Lindquist would finance the exercise – obviously hoping she could not do so – to thwart the exercise only to withhold consent anyway even after Lindquist demonstrated, to the Company's dismay, that Lindquist could finance the transaction.

75. Further, it is arguably to the *benefit* of the Company to allow holders to exercise options because the Company would receive the proceeds thereof (and there are many other option holders who may have strike prices similar to and/or higher than Plaintiffs), as well as to establish goodwill by allowing the persons who contributed to the Company's success to share in the benefits thereof.

76. The whole point of granting Plaintiffs the options was to allow them to participate in the Company's success should it occur, and there is simply no reasonable justification for depriving Plaintiffs of this opportunity to participate. Given the massive wealth obtained by Pender and Sabel, there is no good faith basis for their attempts to frustrate Plaintiffs' exercise. Upon information and belief, Pender's and Sabel's strategy is simply to cause the options to expire

and become worthless by frustrating their exercise until they expire, in order to benefit themselves personally.

77. In the alternative, upon information and belief, Pender and Sabel are trying to benefit themselves by consolidating their ownership of the Company and doing so by causing the Company to enter into agreements for substantial buybacks of stock, and by wrongfully preventing exercises of options until the expiration thereof, all as a way to avoid dilution of the shares they each own at zero cost and increase their ownership of the Company, which, upon information and belief, has recently increased from approximately 50% to approximately 80%.

78. As set forth above, Pender and Sabel are well aware that nearly $1 billion in stock options are outstanding and there is a significant risk of dilution to them personally in the event options are exercised; thus, Pender and Sabel are acting purely in their own personal self-interest to prevent exercise, thereby acting in bad faith.

79. The Company has breached and/or repudiated its obligations under the 2017 Option Agreements and/or the implied covenant of good faith by acting improperly and in bad faith to frustrate Plaintiffs' respective attempts to receive the fruits of their respective options, namely the shares, which are the very reason they each became associated with the Company in the first place.

80. Plaintiff have fully performed each of their respective obligations under the respective 2017 Option Agreements.

81. Plaintiffs would not have joined the Company, provided services to the Company, or allowed the Company to use and benefit from their respective name, reputation and/or professional credibility but for the options and the upside the options presented.

82. The Company's breach and/or repudiation of its obligations as set forth above under have caused Plaintiffs damages in an amount to be determined at trial but believed to be not less

than $77,408,558, collectively (Lindquist $20,490,558; Ruggirello $35,715,000; and Dillbeck $21,203,000).

WHEREFORE, Plaintiffs demand judgment as follows:

(i) On the First Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial but not less than $77,408,558 (Lindquist $20,490,558; Ruggirello $35,715,000; and Dillbeck $21,203,000), plus interest, attorneys' fees and costs to the extent allowable by law; and

(ii) For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand trial by jury.

Dated: July 6, 2023

SULLIVAN & WORCESTER LLP

By: */s/ Michael T. Dyson*
 Michael T. Dyson (VA Bar No. 40962)
 1666 K Street, NW
 Washington, D.C. 20006
 Telephone: (202) 775-1217
 Facsimile: (202) 775-6875
 mdyson@sullivanlaw.com

Gerry Silver, Esq.
(seeking admission pro hac vice)
SULLIVAN & WORCESTER LLP
1633 Broadway, 32nd Floor
New York, New York 10019
Telephone: (212) 660-3096
Facsimile: (212) 660-3001
gsilver@sullivanlaw.com

4884-4457-5342, v.1